J-S20045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOAN L. ROGERS | : | |
| | : | |
| Appellant | : | No. 1104 MDA 2023 |

Appeal from the Judgment of Sentence Entered June 27, 2023
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-SA-0000005-2022

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: JULY 18, 2024**

Appellant, Joan L. Rogers, appeals from the judgment of sentence entered at the conclusion of her summary trial by the Court of Common Pleas of Huntingdon County, which imposed a $50.00 fine plus payment of costs associated with the prosecution of the charge of a single count of Disorderly Conduct—Unreasonable Noise, 18 Pa.C.S.A. § 5503(a)(2).  We affirm.

The relevant facts and procedural history are as follows:  On October 12, 2021, the Huntingdon County Commissioners had completed their weekly 9 a.m. public meeting held in the commissioners' meeting room of the county courthouse, and Commissioners Jeffrey Thomas and Jeffrey "Scott" Walls were conducting a private meeting with a constituent by appointment, as they often do after concluding a public meeting, when Ms. Rogers entered the room

---

[*] Former Justice specially assigned to the Superior Court.

asking to speak with Commissioner Mark Sather. N.T., 4/12/23, at 5. According to the testimonies of Commissioners Thomas and Walls, they know Ms. Rogers personally, and they informed her that Commissioner Sather was not present. N.T. at 5. Ms. Rogers repeated five or six times, however, that she needed to speak with Commissioner Sather, and each time the commissioners responded that he was not present and asked Ms. Rogers to leave the private meeting. N.T. at 5. Commissioner Walls testified that Ms. Rogers "got louder as she came in, more aggressive, I guess." N.T. at 20.

It was Commissioner Thomas' testimony that Ms. Rogers, who was 67 years old at the time,[1] knew from her experience with public meetings that the public meeting had concluded and that one does not approach the commissioners' desk the way she did. N.T. at 17. Commissioner Thomas testified, "So, what triggered the event was probably me. I finally raised my voice because we were in a meeting and said, 'Joan, you're going to have to leave,' and at that time the deputy heard me, came in, [and] asked her to leave." N.T. at 5-6.

Thomas denied screaming or shouting at Ms. Rogers, maintained that he had been respectful to Ms. Rogers during her repeated questions, and explained that he raised his voice enough for the deputy to come in. N.T. at

---

[1] Although the Brief of Appellant prepared by counsel indicates that Ms. Rogers was 61 years old at the time in question, Ms. Rogers testified at the summary trial that she was 67, a statement corroborated by the "Defendant Information" section of the Court of Common Pleas of Huntingdon County's Summary Appeal Docket, which lists Ms. Rogers' birthdate as 05/16/1955.

17.    He testified that the deputy and Ms. Rogers eventually left the room, "and then it got very loud with the comments[,]" particularly when he heard Ms. Rogers tell the deputy in an "extremely loud" voice to "stand down, stand down." N.T. at 6, 9. Commissioner Thomas could not hear the deputy's voice in reply. N.T. at 9.

Deputy Sheriff Stanley Snyder, who has served 15 years with the Huntingdon County Sheriff's Department, testified that he was seated about 12 to 15 feet outside the Commissioners' meeting room in the area where deputies monitor metal detectors and check in members of the public entering the courthouse. N.T. at 31, 36. He recalled that Ms. Rogers came through the front door of the courthouse and cleared the metal detector, and he permitted her to walk to the door of the Commissioners' meeting room, look through its window, and walk in. N.T. at 31, 41. The deputy testified that he has worked at this post for many commissioner meetings, N.T. at 37, but at the time in question he did not realize the public meeting was over and that a private meeting had ensued because he had left the area momentarily to conduct his routine security check of the courthouse. N.T. at 31, 41.[2]

The next thing Deputy Snyder heard was Commissioner Thomas raising his voice. N.T. at 31. Upon entering the meeting room in response, the deputy testified, he assessed the situation and addressed Ms. Rogers, directing her, "he [Commissioner Thomas] told you to leave several times,

_____

[2] A second deputy remained at the metal detectors during this time. N.T. at 42.

now get out." N.T. at 32. Ms. Rogers replied, "Who do you think you're talking to?", to which he retorted, "Now you can leave the courthouse because you're very loud and belligerent." N.T. at 32, 34, 42.

According to Deputy Snyder, Ms. Rogers raised her voice to a very loud level in response and said, "Make me." N.T. at 32. The deputy replied, "No, you can leave the courthouse," but Ms. Rogers repeated, "Make me." Deputy Snyder testified that he walked to his phone and placed a call to the Sheriff's office requesting they activate courthouse cameras to record the interaction taking place. N.T. at 32. He testified that he repeated his command to leave the courthouse several more times, but Ms. Rogers refused, kept saying "make me, make me[,]" and was getting "very loud, obnoxious, very belligerent." N.T. at 32. It was at this point, according to the deputy, that Ms. Rogers told him to "stand down."

At this time, the deputy testified, he looked up and noticed people in the courthouse had stopped to observe the scene, including those "by the Prothonotary's Office clear at the other end [of the courthouse]." N.T. at 33. Eventually, the deputy related, Ms. Rogers "very slowly" left voluntarily at his repeated directions. N.T. at 33. Deputy Snyder was the affiant of the disorderly conduct charge he filed against Ms. Rogers.

Ms. Rogers testified that she went to the courthouse that morning to attend the commissioners weekly public meeting for "no particular reason." N.T. at 47. She knew the commissioners "meet every Tuesday usually", and

she had "been to enough to know what's going on because . . . I pay attention and I'm a councilwoman." N.T. at 55.

She described how she went through the visitor check-in, where Sheriff Lippman asked where she was going. N.T. at 47. Ms. Rogers told the sheriff she was going to the commissioners' meeting and pointed to the door of the meeting room. N.T. at 47. Deputy Snyder and Deputy Sheriff Lippman allowed her to go to the meeting room, and Ms. Rogers walked to the door and entered. N.T. at 48.

According to Ms. Rogers, she "had barely even got through the door" when she heard Commissioner Thomas "disrespectfully loudly yelling, 'We're in a meeting.'" N.T. at 49. Ms. Rogers believed the public meeting was in progress when she opened the door, and she was "kind of stunned" by Commissioner Thomas' words and tone. She testified that she asked if the meeting was over, and Commissioner Thomas again used a disrespectful tone when he answered, "Yes." N.T. at 49.

After that, Ms. Rogers continued, she said to the commissioners that she had one more question, namely, if Commissioner Sather was around. They said he was not, and, so, Ms. Rogers testified, she turned to leave because she "had no more business there." N.T. at 49. She denied that she was trying to "hunt down" or "desperately find" Commissioner Sather. N.T. at 49.

Ms. Rogers testified that when she turned to exit the room, she encountered Deputy Snyder, who, she claimed, "starts bullying me." N.T. at 49.

> What I mean by that is he started disrespecting me, mumbling, saying something that I didn't really understand. I know he was just bullying me. So I kept walking after telling him that I didn't come up in here for this mess this morning and I didn't. So I kept walking. I made it out of the building 'cause whatever was going on that morning I didn't understand it then and I don't understand it now. However, Sheriff Thomas [sic][3] looked at me like I wasn't human or I was a piece of dirt to him which I found very interesting.

N.T. at 49-50.

When asked to recount specifically the initial exchange between Deputy Snyder and her, Ms. Rogers said he was "very rude and disrespectful and, like I said, he was looking down at me as if I wasn't human or I wasn't worthy of respect." N.T. at 51. She continued, "There was no conversation. Like I said, he was bullying me and I was already shocked at the disrespect I had just received from opening the door." N.T. at 58-59. She emphasized that she was leaving, N.T. at 51, and yet the Deputy was, in her opinion, "definitely escalating the situation as I was leaving." N.T. at 52. "He kept taunting me, bullying me. Had something to say and, you know, every action has a reaction." N.T. at 52.

She testified that she clearly heard him when he "rudely told me to 'get out'"[,] which, she maintained, caused her to "stop[] in my tracks." N.T. at

---

[3] Ms. Rogers later clarified that she was referring to "Sheriff Snyder." N.T. at 50.

52. It was then, she admitted, that she "looked over to him and I said, well, 'make me', but I merely turned and walked away because I seen he was being disrespectful."[4] When asked on cross-examination what the tone of her voice was at that moment, she said it was probably the same tone she was using on the witness stand. N.T. at 57.[5]

She continued that, "everybody was just being disrespectful that day for whatever reason." N.T. at 52. "I didn't have to be at that meeting[,]" she said, "[b]ut to have to go to a public meeting where I pay taxes and to encounter that behavior that morning, I was appalled then and I'm appalled now. And I left, went out the building and that's what happened." N.T. at 52.

Ms. Rogers denied telling anyone to "stand down", asserting, "I don't even use those words because what does it mean when you're being bullied." N.T. at 53. She also denied responding to Deputy Snyder's directive with, "Who do you think you're talking to." N.T. at 57. As for Deputy Snyder's testimony that she deliberately walked "very slowly" when directed to leave the courthouse, Ms. Rogers explained, "It was slow or if it was my stride – I'm 67 years old and I walked the way I walk. You know, it's not as fast as I was when I was 20." N.T. at 53.

---

[4] On cross-examination, Ms. Rogers testified that her reaction to Deputy Snyder's yelling at her to leave was to say, "Make me." N.T. at 56.

[5] The prosecution asked Ms. Rogers whether, during her testimony on direct examination, she was "getting a lot of feedback from that mic" and if she "even pushed it away," and Ms. Rogers agreed both statements were accurate. N.T. at 58.

When asked if she had any intention to disrupt or alarm the public, Ms. Rogers answered, "No, because it wasn't even that serious. I was just going to a public meeting. If someone had told me that the meeting was over, I would have been okay with that. I didn't have to go in the building." N.T. at 53. When asked by defense counsel to identify her "race," she answered, "I'm African American." N.T. at 53.

On May 5, 2023, the trial court issued its "Opinion and Order" in which it found the Commonwealth sustained its burden of proof beyond a reasonable doubt that Ms. Rogers was guilty of violating Disorderly Conduct – Unreasonable noise, pursuant to 18 Pa.C.S.A. § 5503(a)(2). In reaching its verdict, the trial court made the following pertinent findings of fact, as summarized in its subsequent Pa.R.A.P. 1925 opinion:

- Ms. Rogers entered the Commissioners' Meeting Room after the end of the public meeting, asked for Commissioner Sather, and repeatedly said that she needed to talk to Commissioner Sather after being told that he was not there;

- Ms. Rogers then engaged in an argument with the Commissioners and was told that she needed to leave;

- Commissioner Thomas raised his voice and told Ms. Rogers that she needed to leave, which drew the attention of Deputy Snyder;

- Deputy Snyder entered the Meeting Room and told Ms. Rogers that she needed to leave;

- Once Ms. Rogers left the Meeting Room, she engaged in a loud and belligerent verbal altercation with Deputy Snyder in the vicinity of the security station, repeatedly challenging

> his authority and daring him to take physical action to remove her from the courthouse;
>
> - The noise and commotion disturbed and drew the attention of other people on the first floor of the courthouse, extending all the way to the far end of the hall; and
>
> - Ms. Rogers continued to argue and make loud statements as she slowly made her way out of the building.

Trial Court Pa.R.A.P. 1925(a) Opinion, 9/18/23, at 7.

Specifically, the trial court explained in its initial order and opinion that "the concern with the behavior of Defendant Rogers emanates from her comments "Make me" (which she admits) and words to the effect of "Do you know who you are talking to?" (which she denies)." Trial Court Order and Opinion, 5/5/23, at 10. Such statements challenging the deputy directly were made in a "very loud" and "belligerent" voice in a public space within the courthouse during business hours, and they caused people throughout the courthouse to stop and watch the interaction taking place. *Id.* at 11.

On appeal, Ms. Rogers challenges the sufficiency of evidence offered to prove both the *actus reus* and *mens rea* elements of the section 5503(a)(2) disorderly conduct charge under which she was prosecuted. Specifically, she contends evidence of her conduct established neither that she committed the act of making unreasonable noise nor that she acted with the intent to cause a public inconvenience, annoyance, or alarm or by recklessly creating a risk thereof. We disagree.

We review Ms. Rogers' sufficiency claim under the following standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bertothy*, 307 A.3d 776, 780–81 (Pa. Super. 2023) (citation omitted).

Ms. Rogers was convicted of disorderly conduct under section 5503(a)(2), which states: "A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... makes unreasonable noise[.]" 18 Pa.C.S. § 5503(a)(2). The offense of disorderly conduct

> is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community. It has a specific purpose; it has a definite objective, it is intended to preserve the public peace.

- 10 -

*Commonwealth v. Maerz*, 879 A.2d 1267, 1269 (Pa. Super. 2005) (quotation omitted).

Ms. Rogers argues the Commonwealth failed to offer sufficient proof of the *actus reus* element of Section 5503(a)(2), namely, that she made an unreasonable noise. Relying on the Model Penal Code, this Court has said that the Section 5503(a)(2) "prohibition against unreasonable noise is directed at volume of speech not its content." *Maerz*, 879 A.2d at 1270 (quoting *Commonwealth v. Gilbert*, 674 A.2d 284, 287 (Pa. Super. 1996) (quoting Model Penal Code and Commentaries § 250.2 commentary at 346 (Official Draft and Revised Comments 1980)).

The Supreme Court of Pennsylvania has defined "unreasonable noise" as "not fitting or proper in respect to the conventional standards of organized society or a legally construed community." *Commonwealth v. Greene*, 189 A.2d 141, 143 (Pa. 1963). *See also Commonwealth v. Knowles*, No. 1121 MDA 2023, 2024 WL 2076712, at *3 (non-precedential decision) (Pa. Super. Ct. May 9, 2024).[6] In this regard, courts look to evidence that the level of noise was inconsistent with tolerance standards of the setting involved. *Maerz*, 879 A.2d at 1270 (Pa. Super. 2005) (citing *Gilbert*, 674 A.2d at 287 (deeming pertinent the noise tolerance standards of the neighborhood in question)).

---

[6] Non-precedential decision cited for its persuasive value, *see* Pa.R.A.P. 126(b).

In **Knowles**, a panel of this Court reviewed whether the evidence of the defendant/appellant's disruptive conduct in a post office proved beyond a reasonable doubt Knowles either intentionally or recklessly made an unreasonable noise as prohibited under Section 5503(a)(2). The facts admitted at trial were that Knowles encountered in the lobby of the local post office an off-duty Pennsylvania State Trooper who had arrested him previously on a PFA. Amidst patrons waiting in line for service, Knowles said, "I know who you are." The trooper pretended not to recognize Knowles, but Knowles persisted that he knew the trooper, raised his hands over his head, raised his voice, and said, "I'm scared, I'm scared." **Knowles**, at *1.

The postmaster went to the lobby to address the obvious disturbance, and Knowles repeated that the trooper "locked him up" and that he was "scared of him." The postmaster moved Knowles to the front of the line to expedite his purchase of stamps and hasten his exit.

The Commonwealth charged Knowles with, *inter alia*, summary disorderly conduct under Section 5503(a)(2), and he was convicted. On appeal, he challenged the sufficiency of the evidence offered to prove unreasonable noise and his *mens rea*. On the issue of whether Knowles made an unreasonable noise proscribed under the statute, we observed:

> In this case, Knowles created a loud enough noise in the post office that he forced the postmaster to leave his office and come into the lobby to investigate Knowles's outburst. The conventional standard of conduct in a local branch of the Postal Service are those of orderly business befitting an executive agency of the federal government.[] The atmosphere in a post office, while not

as formal as a courtroom or house of worship, is typically quiet and reserved.  Patrons enter, stand in line for a few minutes, rarely speak with one another, briefly interact with an employee at the desk, and leave without anything memorable occurring.

Given this societal background of the setting, we hold that there was sufficient evidence from which the fact finder rationally could find that Knowles made "unreasonable noise" for a post office lobby.  Because Knowles elevated his voice to a degree that the postmaster had to get involved and restore the orderly functions of the office, there was sufficient evidence that the "volume of speech" was unduly loud and disorderly.  **Gilbert**, **supra**.  Hence, the trial court could conclude that Knowles's outburst was "unreasonable noise" that was not "proper in respect to the conventional standards of organized society" inside a local branch of the United States Postal Service.  **Greene**, 189 A.2d at 143.

**Knowles**, at *3.

We find **Knowles** instructive and apply its rationale to the present facts. Here, as in **Knowles**, the setting in question is a public space within a government building.  In the case of a county courthouse, there is a societal expectation that civilized discourse and behavior will be maintained to promote a sense of safety and security and to ensure the orderly operation of important business and legal proceedings taking place there.  Sitting as finder of fact, however, the trial court found that Ms. Rogers entered the public hallway outside the commissioners' meeting room shouting belligerently at Deputy Snyder and inviting him to use physical force by daring him to make her leave the courthouse, all while using a voice loud enough to cause persons at the other end of the courthouse to cease what they were doing and look on.  This conduct and noise further disrupted the normal operations of the

courthouse to the extent it kept a uniformed deputy away from his post at the metal detectors and visitor check-in at the main entrance.

Because sufficient evidence supports the trial court's findings of facts and conclusion of law that Ms. Rogers' engaged in an unduly loud and disorderly high volume of speech that did not comport with the conventional standards of organized society within a courthouse, we agree with the trial court that she engaged in the *actus reus* of making proscribed "unreasonable noise" under the disorderly conduct statute.

So, too, does the same set of facts establish Ms. Rogers' *mens rea* of recklessly creating a risk of public inconvenience, annoyance, and alarm. "The *mens rea* requirement of Section 5503[a] demands proof that [a defendant, by their] actions intentionally or recklessly created a risk of causing or caused a public inconvenience, annoyance[,] or alarm." ***Id.*** (citation and original brackets omitted). "The specific intent requirement of [Section 5503(a)(2)] may be met by a showing of a reckless disregard of the risk of public inconvenience, annoyance, or alarm, even if the [defendant's] intent was to send a message to a certain individual, rather than to cause public inconvenience, annoyance, or alarm." ***Commonwealth v. McConnell***, 244 A.3d 44, 51 (Pa. Super. 2020) (citing ***Maerz***, ***supra***). A court may look at the content of a person's speech only to infer the requisite *mens rea* (intent or recklessness). ***Maerz***, ***supra***.

Here, the trial court did not err when it determined that Ms. Rogers recklessly disregarded the risk of public inconvenience, annoyance, or alarm

when she openly and vociferously opposed Deputy Snyder's directives to leave the courthouse while daring him to make her leave. In conducting our review in this regard, we observe that the content of Ms. Rogers' message, "make me", offered in response to the deputy's directive may be considered by the finder of fact in inferring whether she acted with requisite *mens rea*. Given Ms. Rogers' disruptive public conduct manifesting in belligerent hollering at a uniformed deputy sheriff that was loud enough to cause persons across the courthouse to cease their activities and look on, the trial court reasonably concluded that the Commonwealth's evidence presented sufficient evidence that Ms. Rogers acted with a reckless disregard of a risk she would cause public inconvenience, annoyance or alarm within the courthouse setting. Accordingly, we reject Ms. Rogers' challenge to the sufficiency of *actus reus* and *mens rea* evidence offered against her at her summary trial.

Finally, we address Ms. Rogers' claim that the trial court erred in failing to dismiss the disorderly conduct charge against her as *de minimis* pursuant to Section 312 of the Crimes Code. Section 312 provides:

### § 312. *De minimis* infractions

**(a) General rule.--**The court shall dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the conduct of the defendant:

(1) was within a customary license or tolerance, neither expressly negatived by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

(2) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

(3) presents such other extenuations that it cannot reasonably be regarded as envisaged by the General Assembly or other authority in forbidding the offense.

18 Pa.C.S.A. § 312(a).

The Commonwealth contends that Ms. Rogers failed to preserve this claim by first raising it with the trial court, but this Court has explained that a defendant need not preserve such an issue with a motion or objection below, as the language of the statute requires a trial court to dismiss such a prosecution on its own accord upon determining that a defendant's conduct involved *de minimis* infractions. ***See Commonwealth v. Deible***, 300 A.3d 1025, 1033 (Pa. Super. 2023) (citing ***Commonwealth v. Gemelli***, 474 A.2d 294, 300 (Pa. Super. 1984)).

Here, Ms. Rogers asserts her alleged conduct satisfies all three prongs of the *de minimis* statute, but we disagree. The trial court made an unequivocal finding of fact that Ms. Rogers challenged Deputy Snyder to use physical force to make her leave the courthouse and issued that challenge in loud voice that caused persons throughout the courthouse to stop their business and watch the interaction unfold. Such behavior, the trial court explained, was a matter of "concern" that warranted the filing of the charge in the case *sub judice*. Trial Court Opinion, 5/5/23, at 10-11. Therefore, the trial court did not consider Ms. Rogers' infraction *de minimis*, and for the

reasons discussed both in the trial court's opinion and in this decision, we conclude this issue merits no relief.

For the foregoing reasons, we affirm judgment of sentence.

Judgment of sentence is affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/18/2024